* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Glenn. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Glenn with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. That all parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. All parties have been correctly designated, and there is no question as to joinder or misjoinder of the parties.
3. Plaintiff was an employee of defendant-employer IBM Corporation on April 30, 2000, and her title was Senior Financial Analyst. Plaintiff earned an average weekly wage of $877.00.
4. On or about April 30, 2000 a flood occurred at plaintiff's workplace at defendant-employer's premises.
5. After continuing to work in that workplace for a period of time, plaintiff alleges she developed persistent symptoms of neurological and cognitive problems.
6. An employment relationship between the parties existed on or about April 30, 2000 and for a period thereafter, and the carrier on the risk for workers' compensation purposes was Liberty Mutual Group.
7. In addition to the deposition transcripts of the aforementioned witnesses and all exhibits attached thereto, the parties stipulated into evidence in this matter two notebook binders of medical records and bills and house inspection reports, labeled as Volumes I and II. In addition, the parties stipulated into evidence an affidavit by Sharon Poindexter relating to disability benefits received by plaintiff. The parties also stipulated into evidence initial and supplemental Indoor Environmental Consultant report relating to environmental studies done in IBM's Building 61. In addition, plaintiff introduced and the deputy commissioner admitted into evidence 23 exhibits. The undersigned further takes judicial notice of all I.C. forms and orders filed in this case.
8. The issues to be determined by the Commission are as follows:
 a) Whether plaintiff developed an occupational disease as a result of her employment with defendant-employer?
 b) If so, what, if any, benefits is plaintiff entitled to receive under the North Carolina Workers Compensation Act?
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On the dates of the hearing in the matter, plaintiff was 40 years old and married. Plaintiff was not working as of the dates of the hearing.
2. Plaintiff was employed by defendant-employer since 1987 in both New York and then North Carolina beginning approximately in 1995. Plaintiff worked in Building 61 on defendant-employer's premises on April 30, 2000.
3. Plaintiff's typical part-time work schedule for defendant-employer was to work on Mondays, Wednesdays, and Fridays, approximately 26 hours per week.
4. On the evening of Sunday, April 30, 2000, Tim Hitchcock, an industrial hygienist who at the time was employed by IBM (defendant-employer), was informed that there was a flood in Building 61, to which he and a maintenance manager responded. The flood occurred when approximately 30,000 gallons of chilled water were released from the air conditioning system into the building from a laboratory area of Building 61. As a result of their inspection, a decision was made to remove all water-damaged material, including all sheetrock, carpeting, and the lay-in ceiling tiles.
5. During the remediation process of cleaning from the flood, approximately 90 to 95 percent of all water-damaged materials were removed by Friday, May 5, 2000. During the remediation, plastic barriers were utilized, and negative air machines were used to filter out impurities. Some employees were relocated to a different building altogether during the remediation process (plaintiff remained in Building 61). Defendant-employer and its agents used the applicable New York City Department of Health Guidelines during this remediation process; these remediation procedures are more comprehensive than those recommended by the Environmental Protection Agency.
6. As part of the remediation process, on May 4, 2000 bulk samples from within and outside the water damaged areas were collected. Samples from the wallboard had organisms at less than the limits of detection, while samples from the carpet were slightly above the limits of detection. On May 5, 2000, air samples were taken within the water damaged area, from outside of the water damaged area, and from outdoors. Three locations identified did have small visible colonies of fungal growth. All indoor samples except for one contained less potentially mold-causing organisms than those found in the outdoors sample. Plaintiff was away from work on a family vacation during the initial days of demolition beginning May 3rd through May 5th.
7. After the flood and demolition process, hazard assessments were done in response to three air quality complaints. There was a visual inspection done of the offices and the air handling units. Various measurements, such as for carbon monoxide, relative humidity, and temperature were taken, and certain remedial steps undertaken, such as taking the air handling units off outside air so as to lower the humidity level. While dirt was found on the air handling unit's fan (which was later cleaned), the industrial hygienist testified that this was a good thing, as it was evidence that the filters were working. While the dirt in the filters revealed some fungal organisms, this was entirely expected. Mr. Hitchcock testified that his post-flood inspections of Building 61 did not reveal any observable problem with respect to mold concentration.
8. Plaintiff testified she worked a total of 52 days at work from May 1, 2000 through November 3, 2000. This included no work at IBM in June of 2000.
9. Plaintiff went out of work in November 2000 on sickness leave. Plaintiff then began long-term disability leave on or about November 9, 2001. Plaintiff has not returned to work in IBM's Building 61 or worked in any capacity since November 2000.
10. House samples obtained at plaintiff's residence after her visit with Dr. Johanning in October, 2001 identified cladosporium and penicillium on plaintiff's deck.
11. It is undisputed that there were approximately 145 to 150 water leaks between 1998 and 2002 in defendant-employer's Building 61. However, even Dr. Johanning, plaintiff's expert witness, testified that every building with chronic water leaks does not have toxic molds.
12. Approximately seven inspections and/or sampling episodes specific to mold took place in defendant-employer's Building 61 between September 1995, and January 2003. There were fungal spores of different types found, including several Stachybotrys
spores.
13. Fungal spores are ubiquitous in the outdoor and indoor environment. Fungi levels in non-problem indoor environments generally are less than or approximately the same as those outdoors; indoor problems may arise when there are one or more fungal species present in concentrations greater than found outdoors. The mere presence, however, of fungi indoors is not necessarily problematic, but depends on the species of fungi, the amount present, the length of exposure, and individual susceptibility to a particular fungus or fungi. Moreover, the presence of a mycotoxin-producing species does not mean that mycotoxins are actually present in the environment.
14. In fact, the Occupational Safety and Health Administration (OSHA), the National Institute of Occupational Safety and Health (NIOSH), as well as other occupational health-related associations have not established permissible exposure levels, recommended exposure limits, or other limit values for allergens.
15. Plaintiff has a history of being treated medically for allergies and for upper respiratory infections, chronic sinusitis, and gastroenteritis dating back to at least 1994. In 1996, plaintiff also had temporary, significant hearing loss and tinnitus in her right ear after suffering a blow to the right side of her head. Allergy testing subsequent to the workplace flood revealed that she is significantly reactive to grass, pollens, and cats. Plaintiff had a cat in her house as of the date of this allergy testing in September 2000.
16. Prior and subsequent to the workplace flood of April 30, 2000, plaintiff has been seen by numerous physicians due to a myriad of physical problems and complaints. These include, but may not necessarily be limited to: gestational diabetes, migraines, upper respiratory infections and congestion, chronic sinusitis, gastroenteritis, urinary tract infections, disequilibrium and vertigo, back and neck pain with occasional radiation/numbness into her arms, chronic fatigue, right elbow pain after being knocked onto concrete steps at a Durham Bulls baseball game, double vision, depression, loss of concentration and short term memory loss, tinnitus, headaches that are different from her migraines, and body aches.
17. On May 19, 2000, plaintiff called her family physician's office to report that she had recently taken an airplane trip to Texas, after which she developed dizziness and post-nasal drip; she wondered whether she was having inner ear problems. No mention was made by plaintiff of the April 30, 2000 flood or plaintiff's workplace environment. Plaintiff was seen by her family physician on May 22, 2000, who gave an assessment of eustachian tube dysfunction with secondary disequilibrium. Plaintiff's symptoms persisted, and she was referred to an ENT physician, Dr. Mark Clarkson, who she first saw on June 2, 2000. Dr. Clarkson's impression was mild eustachian tube dysfunction with inhalant allergy. Plaintiff's complaints of dizziness, lightheadedness, and imbalance persisted, and she was then referred for a neurologic examination to evaluate possible multiple sclerosis. She initially related to her physicians that the onset of these problems was when she took the airplane trip in early May 2000.
18. Plaintiff was thereafter seen by a number of physicians for her complaints, and underwent vestibular rehabilitation at Duke University Medical Center's Physical and Occupational Therapy. The therapist felt that plaintiff had symptoms consistent with a vestibular disturbance. However, testing done at Duke's Vestibular Testing Laboratory was normal. Despite this, however, plaintiff's doctors continued to suspect an inner ear condition.
19. Plaintiff was then referred by her family doctor to Dr. David S. Zee, a neurologist at Johns Hopkins who specializes in vertigo, dizziness, and imbalance issues. Dr. Zee acknowledged the complexity of the case, but seemed to conclude that an "important contributor" to plaintiff's problems could be a vestibular migraine propensity. Patients with vestibular migraines may or may not have headaches, but can have dizzy spells, imbalance, vertigo, and extreme sensitivity to motion or visual stimulation. Moreover, anxiety, panic, phobic behavior, disorientation, lack of concentration, memory loss, and psychological withdrawal and depression are often associated symptoms. These general symptoms are extremely consistent with plaintiff's symptoms. Finally, Dr. Zee could not see any specific relationship between the flood and plaintiff's symptoms.
20. Dr. Zee recommended psychiatric counseling, and plaintiff thereafter began treating with Dr. Manjusri Chatterjee. Dr. Chatterjee's initial assessment was adjustment disorder with depressed mood, as well as vertigo and dizziness. Dr. Chatterjee increased the dosage of Effexor and embarked on a course of individual therapy sessions. Of note, when plaintiff had seen Dr. Tucci at the Duke vestibular laboratory, Dr. Tucci noted that depression may "significantly contribute to [plaintiff's] symptoms."
21. On October 8, 2001, Dr. Eckardt Johanning, a board certified family medicine physician who specializes in occupational and environmental medicine, evaluated plaintiff. Dr. Johanning took plaintiff's medical and occupational histories, reviewed her previous medical and other records, did a physical examination, and considered alternative exposures and diagnoses to come to a "differential diagnosis," i.e., he attempted to rule out any other diagnosis or cause of plaintiff's complaints. Plaintiff testified she has spent less then 3 hours total with Dr. Johanning in this case.
22. Based upon the testing that he ordered, Dr. Johanning noted that plaintiff had an elevation of Stachybotrys antibodies in October 2001. These numbers decreased through repeat testing in 2002 and 2003, but the 2003 results still showed that plaintiff's elevations were almost three times normal limits, even though at that point she had been out of the workplace, her alleged place of exposure, for almost three years.
23. Plaintiff's husband, who also works for defendant-employer, testified that he collected two samples from Building 61 and forwarded these on to Dr. Johanning. These samples are suspect as they were not properly obtained, handled, and provided to the doctor and were not temporal to plaintiff's alleged exposure. Plaintiff's husband testified the samples were placed in a sandwich bag brought from home and then placed in an automobile during the summer and then shipped to New York.
24. Based upon plaintiff's IgA testing for Stachybotrys, the samples gathered by plaintiff's husband, and his differential diagnosis, Dr. Johanning concluded that plaintiff's exposure at the workplace was a significant contributing factor to her medical problems. However, Dr. Johanning was not made aware of any testing at plaintiff's house that showed that mold was present both inside and outside her house even though he advised this home testing be done.
25. Dr. Johanning referred plaintiff to Wayne A. Gordon, Ph.D., a psychologist who performed a neuropsychological evaluation on plaintiff on April 15 and 16, 2002. Dr. Gordon testified that his tests revealed that plaintiff suffered from cognitive impairment as a result of her exposure to toxic mold in the workplace, even though he admitted that he did not know to how much, if any, toxic mold or for how long plaintiff was exposed. Like Dr. Johanning, Dr. Gordon used a differential diagnosis to determine that there was no other cause for plaintiff's symptoms than her exposure to toxic mold, despite admitting that there were no peer-reviewed studies to support a differential diagnosis in alleged mold exposure cases. Dr. Gordon testified that he was not a mycologist and did not know about mold. Accordingly, his testimony is not afforded as much weight and credibility as that of other witnesses who do have an expertise in mold. Additionally, Dr. Gordon indicated that he did not take into consideration the medications plaintiff was taking at the time he administered his testing, and that in his opinion it would not effect the out come. It should be noted that it would appear to be important as to what outcome the various medications plaintiff was taking at the time of his testing because they could affect the outcome of the testing.
26. Defendants asked Dr. Paul Lees-Haley, tendered as an expert in clinical psychology and neuropsychology, to review plaintiff's medical records including Dr. Gordon's and Dr. Johanning's reports and conclusions. Dr. Lees-Haley testified that Dr. Gordon's conclusions that plaintiff's high memory test scores are inconsistent with Dr. Gordon's ultimate conclusions, and that some of plaintiff's results to Dr. Gordon's testing were inconsistent and simply did not make sense. In addition, Dr. Lees-Haley further questioned Dr. Gordon's conclusions because Dr. Gordon apparently failed to rule out other disorders, such as somatoform disorder, and failed to account for other possible causes of plaintiff's purported cognitive deficits such as side effects from medication or malingering. While Dr. Lees-Haley acknowledged that he is not an expert qualified to testify regarding whether certain molds are toxic, based upon his review of the applicable research, he was able to testify that it has not been established that inhalation of mold spores or mycotoxins causes brain damage in humans. Accordingly, Dr. Lees-Haley's opinion is that there is no basis to conclude that plaintiff's exposure in the workplace, if any, to toxic molds placed her at an increased risk of developing the medical conditions with which she suffers, or that her job significantly contributed to her symptomatology. Dr. Lees-Haley also testified that is very important to know what medications a patient is taking at the time testing is performed because depending on the medication it can effect the out come of the test.
27. Dr. Ronald Gots, a medical physician tendered as an expert in occupational and environmental medicine and toxicology (a doctorate in toxicology), also provided an expert opinion after reviewing all of plaintiff's medical records and technical reports. Dr. Gots noted that plaintiff's allergy testing was negative for molds, but that her allergy to her cat may be relevant to her symptoms. In addition, Dr. Gots, an expert on causation and the health effects of mold contamination, noted that Stachybotrys antibodies have not been widely validated as a measure of Stachybotrys exposure, and in fact, this allergy testing has not been approved by the FDA (this is noted on the actual test results in evidence). It was the opinion of Dr. Gots that plaintiff's job did not place her at an increased risk as compared to members of the public not so employed of developing her symptomatology, and that plaintiff's employment did not significantly contribute to her medical problems.
28. Dr. Howard Weiner was tendered as an expert and noted as being board certified in internal medicine, allergy and immunology, and occupational and environmental medicine. Dr. Weiner also has a master's degree in industrial hygiene and toxicology. Defendants asked Dr. Weiner to review plaintiff's medical records and all records relating to indoor air quality or toxicologic issues. Consistent with Dr. Gots' testimony, Dr. Weiner testified that there was no evidence based medicine or literature of which he was aware that supported plaintiff's theory that cognitive deficits can be attributed to exposure to molds. Dr. Weiner's opinions were strongly influenced by the simple fact that plaintiff's allergy skin testing was negative for mold, and a positive allergy test is a prerequisite for an allergic reaction. Furthermore, Dr. Weiner opined that there was nothing to indicate that plaintiff has allergic fungal sinusitis, which would strongly indicate causation from mold exposure. As regards plaintiff's persistent complaints of dizziness, Dr. Weiner's impression was that this symptom is psychophysiologic in nature. It was further the opinion of Dr. Weiner that plaintiff's job did not place her at an increased risk as compared to members of the public not so employed of developing her symptomatology, and that plaintiff's employment did not significantly contribute to her medical problems.
29. Plaintiff relies in large part on the Indoor Environmental Consultant (IEC) reports dated March 16, 2003 and March 23, 2004. These reports detailed fungal growth sites in Building 61 from testing in the building done on January 23, 2003. These reports concluded that the findings were not consistent with an acceptable indoor air quality environment. However, only a singleStachybotrys spore was found in one sample, and with the exception of one sample, the average outdoor exposure was 1.1 to 9.6 times greater than indoors, which is normal. Furthermore, this testing is not particularly persuasive or even relevant, as it took place almost three years after the workplace flood, and greater than two years after plaintiff went out of work.
30. Dr. Gordon, the psychologist to whom plaintiff was sent and evaluated, was not given information regarding the amount of time that plaintiff was exposed to any mold in the workplace, and further, he was unaware of any properly controlled studies showing a relationship or link between indoor mold exposure and the development of cognitive impairments. In fact, Dr. Gordon agreed that the Centers for Disease Control has indicated that it has not been proven that there is a causal link between the presence of toxic molds and medical conditions such as memory loss.
31. While Dr. Gordon testified that there does not need to be a dose response (i.e., the extent to which a person's exposure to a hazardous substance causes a health problem) to render an opinion in this case, it is significant that Dr. Gots, a Ph.D.-level toxicologist, testified that dose response is a fundamental essential principle of basic toxicology, and that the dose of mycotoxins required to produce any kind of toxicity is in the one to ten million spore range. There is no evidence of record to indicate that there was ever found in Building 61 mycotoxin spores in that high a concentration in any sampling or testing done.
32. There is no evidence showing that plaintiff was exposed at some time or for certain periods of time to mold in the workplace that may have been toxic. In addition the evidence is insufficient on its face to prove that any alleged exposure caused plaintiff to develop the conditions with which she was subsequently diagnosed, particularly given the fact that mold and fungi are ubiquitous in nature. The evidence, taken as a whole, shows that the mere presence of Stachybotrys does not necessarily mean that mycotoxins are or was present. In addition, the evidence, taken as a whole, is nebulous at best as to how much exposure, if any, to mycotoxins such as Stachybotrys is necessary to cause health problems in humans or how much exposure, if any, plaintiff actually had.
33. Based upon the evidence and testimony taken as a whole, defendants' expert witnesses are afforded greater weight and credibility herein than that of plaintiff's witnesses, particularly based upon plaintiff's own expert witness' admissions and testimony in this case.
34. From November 2000 through November 5, 2001, plaintiff received SA benefits in the monthly amount of $3,800.10, for a total amount received of $45,255.74. These SA benefits are fully funded by defendant-employer.
35. Beginning November 9, 2001, plaintiff began receiving long-term disability benefits at 66.67% of her regular monthly compensation, or, $2,533.53 per month (in November 2001 plaintiff received a partial month of benefits, or, $1,842.57). Plaintiff was continuing to receive these benefits as of the date of the hearing in the matter, and had received a total of $55,737.66 in long-term disability benefits from December 2001 through September 2003. These long-term disability benefits are fully funded by defendant-employer.
36. Based upon the greater weight of the evidence, there is insufficient evidence from which the undersigned can find and hold that plaintiff has proven that she contracted a compensable occupational disease by virtue of her alleged exposure to toxic mold in the workplace, either as a result of the April 30, 2000 flood or to her work conditions and work environment prior and subsequent to, and irrespective of, the April 30, 2000 flood.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed by the greater weight of the evidence to prove that any disease or condition from which she suffers is characteristic of individuals engaged in the particular trade or occupation in which the claimant is engaged, as relates to either the April 30, 2000 flood or to her work conditions and work environment prior and subsequent to, and irrespective of, the April 30, 2000 flood. N.C. Gen. Stat. § 97-53(13); Rutledge v.Tultex Corp., 308 N.C. 85, 93, 301 S.E.2d 359 (1983).
2. Plaintiff has also failed by the greater weight of the evidence to prove that her employment conditions, as relates to either the period immediately following the April 30, 2000 flood or to her work conditions and work environment prior and subsequent to, and irrespective of, the April 30, 2000 flood, placed her at an increased risk as compared to members of the general public not so employed of contracting the diseases or conditions from which she allegedly suffers. N.C. Gen. Stat. §97-53(13); Rutledge v. Tultex Corp., 308 N.C. 85, 93,301 S.E.2d 359 (1983).
3. Plaintiff has further failed by the greater weight of the evidence to prove that there is a causal connection between her myriad medical problems and her employment with defendant-employer. N.C. Gen. Stat. § 97-53(13); Rutledge v.Tultex Corp., 308 N.C. 85, 93, 301 S.E.2d 359 (1983); Robbinsv. Wake Co. Bd. of Educ., 151 N.C. App. 518, 566 S.E.2d 139
(2002).
4. Plaintiff has not met her burden of proving that she contracted a compensable occupational disease within the meaning of the Workers' Compensation Act. N.C. Gen. Stat. § 97-53(13). Accordingly, plaintiff's claim for benefits under the Act must fail.
5. While the greater weight of the evidence leads to a conclusion that plaintiff's claim is not compensable under the North Carolina Workers' Compensation Act, if the claim were found to be compensable, defendants would be entitled to a full credit for all SA and all long-term disability benefits paid to plaintiff. N.C. Gen. Stat. § 97-42.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Under the law, plaintiff's claim for workers' compensation benefits must be, and the same is, HEREBY DENIED.
2. Each party shall bear its own costs of this proceeding.
This the ____ day of January, 2006
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/______________ PAMELA T. YOUNG COMMISSIONER